UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Roberta B. Mack, | ) | C/A No. 3:12-2960-MGL-KDW |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| South Carolina Department of | ) | |
| Transportation and John Walsh, Brian | ) | |
| Parnell, Clem Watson and Kenneth Eargle | ) | |
| in their individual capacities, | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiff Roberta B. Mack ("Plaintiff" or "Mack") filed this action against her employer, Defendant South Carolina Department of Transportation ("DOT"), as well as individual Defendants John Walsh, Brian Parnell, Clem Watson, and Kenneth Eargle, alleging race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended. She also brought a common-law claim of civil conspiracy as to Walsh, Parnell, Watson, and Eargle (collectively herein the "Individual Defendants"). Am. Compl., ECF No. 10. At the close of discovery, both the DOT and the Individual Defendants moved for summary judgment. ECF Nos. 42, 43. Plaintiff responded to these motions, ECF Nos. 45, 46, and DOT filed a reply, ECF No. 50. This matter is before the court[1] pursuant to 28 U.S.C. § 636(b) and Local Civil Rule 73.02(B)(2) (D.S.C.) for a report and recommendation regarding these two pending dispositive motions. Having reviewed the parties' submissions and the applicable law, the undersigned recommends DOT's Motion, ECF No. 43, *and* the Individual Defendants' Motion, ECF No. 42, be *granted* and this matter be ended.

---

[1] This matter was referred to the undersigned on December 12, 2014. ECF No. 54.

I.     Factual Background[2]

Plaintiff was employed by DOT from 1982 until 1996 in the Contracts Administration unit of the Construction Office where she performed clerical and administrative duties. In 1996, she resigned to run a family business. She returned to employment with DOT in 2000 when she was hired as a Procurement Specialist in Contract Administration; she had two or three subordinate employees at that time. In March 2006, Director of Construction Danny Shealy reassigned Contract Administrator Greg Peck to another position and selected Plaintiff to fill the Contract Administrator position. As Contract Administrator, Plaintiff supervised five subordinates and was responsible for coordinating and processing advertisements, lettings, bids, and contracts for construction contracts awarded to the lowest bidder. She was supervised by Brian Parnell, who reported to the Director of Construction, Mr. Shealy. The Contract Administrator position represented a promotion for Plaintiff from pay band 5 (Procurement Specialist II) to pay band 7 (Program Manager I) and a $12,500 increase in her annual salary. Pl. Dep. 12-30, 32-33, 106-115, 129-31.[3]

Wendy Hollingsworth, another Program Manager I at DOT, was responsible for coordinating and processing bid lettings, bids and contracts for architectural and engineering ("A & E") construction contracts that were evaluated and awarded on a quality/qualification basis rather than low-bid basis. Prior to 2009, Plaintiff and Ms. Hollingsworth worked in different divisions of DOT: Plaintiff was assigned to the Engineering Division's Construction Office; and Ms. Hollingsworth was assigned to the Finance and Administration Division's Procurement Office. In February 2009, Ms. Hollingsworth was transferred from Procurement to the Construction Office's Professional Services unit at her existing classification and salary and, for the first time, came under the supervision of Engineering

---

[2] As it must, the court considers the facts in the light most favorable to Plaintiff, the nonmoving party. These facts are derived from DOT's Motion and Plaintiff's Response thereto. To the extent necessary, additional facts related to the Individual Defendants' Motion and Plaintiff's Response to that Motion are set out in the portion of this Report and Recommendation addressing same.

[3] As often is the case, the record does not contain a full transcript of referenced depositions. Excerpts of Plaintiff's deposition transcript are found at ECF Nos. 43-3, 46-1, and 50-2.

Division managers. Pl. Dep. 37-41, 63-64, 127-34. Ms. Hollingsworth's salary was and remains $16,000 more than Plaintiff's even though they were both classified Program Manager I and were both in state pay band 7. According to Plaintiff, Ms. Hollingsworth "was brought into Construction doing the same thing I was doing, just on a different level as far as how we received the bids or how we received the contracts[.]" Pl. Dep. 41. Noting that Plaintiff had supervisory duties that Ms. Hollingsworth did not, sometime after February 2009 and before December 2009, Plaintiff asked her supervisor, Defendant Parnell, to request a salary equity analysis[4] to determine whether an upward adjustment to her salary was appropriate. Pl. Dep. 37-42, 77-80, 120-30, 179-80.

In an email dated October 7, 2009, Plaintiff followed up with Defendant Parnell concerning her request for a salary analysis. ECF No. 46-7. Defendant Parnell responded on October 8, 2009 that he would "look into this." *Id.* When Plaintiff followed up with Defendant Parnell on October 22, 2009, he immediately responded, "I am working on something. Just be patient." *Id.*

On December 2, 2009, before she received response from Defendant Parnell on her request for a salary equity analysis, Plaintiff and Ms. Hollingsworth were called into a meeting with Defendant Parnell and Mr. Shealy at which Mr. Shealy informed Plaintiff that he was immediately reassigning her to the Professional Services unit to work with Ms. Hollingsworth. Mr. Shealy explained that he was making this move in an effort to improve Professional Services' working relationship with DOT's Contract Services Office, which had complained about Ms. Hollingsworth. He told Plaintiff that he thought that her working with Ms. Hollingsworth would help "mend some fences here." Pl. Dep. 45. Mr. Shealy also said that this reassignment was necessary for him to move forward with the salary

---

[4] DOT's Human Resources Director testified that "the purpose of a salary equity analysis is to be sure that an employee is paid properly for their job duties and responsibilities." Monts-Chamblee Dep. 103, ECF No. 43-4. (Other excerpts of Ms. Monts-Chamblee's deposition transcript may be found at 46-2 and 50-3). In making this determination, DOT "looks at the employee's background and experience and their job duties as compared to others within [DOT] [who have] with similar background, duties and experience." *Id.* at 104.

equity analysis that Plaintiff had requested through Defendant Parnell. Pl. Dep. 42, 44-46, 50, 52-55, 63-67, 79-80, 139-41, 154-57, 182-83.

Plaintiff testified that she believed she was reassigned so that Defendant Parnell could place his Caucasian friend, Susie Lominick Bender, in Plaintiff's Contract Administrator job. Pl. Dep. 45, 47-50, 136-39. The reassignment took effect immediately (on December 2, 2009), but Plaintiff was not physically moved to Ms. Hollingsworth's area until several weeks later, at which time she was moved to an office smaller than the one she previously occupied that was just down the hall next to Ms. Hollingsworth. Pl. Dep. 45, 64-68, 139-42.[5] According to Plaintiff, Ms. Hollingsworth was also unhappy about the reassignment and perceived that Mr. Shealy and Defendant Parnell were "infringing" on her position. Ms. Hollingsworth was reluctant to share any of her work with Plaintiff, which frustrated Plaintiff and caused them to have a strained working relationship. Pl. Dep. 48-49, 73-74. Plaintiff asserts she was stripped of her supervisory duties when she transferred to Professional Services.[6] Plaintiff testified that, once in the Professional Services Offices, she was not properly trained and was not provided with an adequate job description. Pl. Dep. 45-47. Plaintiff and Ms. Hollingsworth were reassigned to supervision by Defendant Eargle. Pl. Dep. 84, 151-52.[7]

Around the same time of the transfer, Defendant Parnell advised Plaintiff that the salary equity analysis she had requested had been completed and that she was eligible for a six-percent pay increase. Pl. Dep. 79, 134-35. However, no increase was implemented. *Id.* at 41-42, 54-55, 150-51.

Plaintiff continued to be supervised by Defendant Parnell until around July 28, 2010. Pl. Dep. 43. In May and in July 2010, Plaintiff talked to Mr. Shealy (Defendant Parnell's supervisor) about moving her back to her old job as Contract Administrator and assigning Susie Lominick Bender to

---

[5] Plaintiff testified that in December 2010, she was moved from the smaller office in Professional Services to a cubicle. Pl. Dep. 142-43.

[6] *See* Pl. Mem. 5. The deposition pages cited do not reference her being stripped of supervisory duties.

[7] Plaintiff also asserts that, when moved to Defendant Eargle's supervision, she was subjected to particularized complaints from him that her similarly situated white coworkers who had not complained about unfair pay were not. Pl. Mem. 6 (citing to Monts-Chamblee Dep. 23, 25). However, Plaintiff has not provided those pages to the court, nor are they otherwise contained in the record.

work with Ms. Hollingsworth. During their July 2010 conversation, Mr. Shealy told Plaintiff that he had concluded that, in hindsight, the reassignment was not a good decision and said that he would ask his superiors about moving her back to her former position and assigning Ms. Bender to work with Ms. Hollingsworth, as Plaintiff had requested. Pl. Dep. 157-58, 169-78. Before Mr. Shealy acted on Plaintiff's request, though, he was asked to retire. Pl. Dep. 151-53, 157-58. Mr. Shealy retired at the end of July 2010. On July 28, 2010, Plaintiff and Ms. Hollingsworth were transferred within the Engineering Division from Construction to Operations, and Kenny Eargle, Assistant Chief Engineer for Operations, assumed supervisory responsibility over them. Pl. Dep. 43, 68-73, 84-85, 152-53, 157-58. Plaintiff informed Defendant Eargle soon after her transfer to his supervision that "there was a 6 percent [raise] that [she] was kind of looking for." She testified that "he flat out told [her], 'Well, there is no money[.]'" Pl. Dep. 85. At some point[8] after assuming supervision over them, Defendant Eargle moved Plaintiff and Ms. Hollingsworth from the adjoining private offices where they had been since December 2009 to work cubicles in his area. Pl. Dep. 88-89, 144-46.

On August 26, 2011, Plaintiff filed a charge of discrimination with the South Carolina Human Affairs Commission ("SHAC") and the United States Equal Employment Opportunity Commission ("EEOC"). In her charge, she alleged that she had been discriminated against because of race and in retaliation for complaining about race discrimination.[9] *See* Charge (Aug. 26, 2011), ECF No. 43-3 at 146. In particular, Plaintiff alleged that she "was denied equal wages from on or about December 1, 2009 through June 27, 2011, and continuing[ ]" and that she "was subjected to disparate terms and conditions and intimidated from on or about October 15, 2010, through on or about April 11, 2011, and continuing." *Id.* Plaintiff set forth the particulars of her claims as follows:

> After I requested a salary analysis, I was moved from program manager to a new position. The format for the new position was never completed. The respondent refused to put me back in my old position and replaced me with a younger white female.

---

[8] The timing of the move to cubicles is discussed within.
[9] Plaintiff's charge also alleged that she had been discriminated against because of age, but she has not pursued that claim.

> Everyone else that was moved as a result of my transfer was compensated, but I was not. Additionally, the terms and conditions of the initial move were never fulfilled and I was transferred again. I complained and requested a salary analysis again. I believe the move to my current position was retaliatory in order to prevent me from receiving my compensation.

*Id.*

Following an investigation, both SHAC and the EEOC issued right-to-sue notices. *See, e.g.*, ECF No. 46-9 at 24 (SHAC Right-to-Sue Notice). This action followed.

II.    Standard of Review

The court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). If a movant asserts that a fact cannot be disputed, it must support that assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In considering a motion for summary judgment, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248.

The party seeking summary judgment shoulders the initial burden of demonstrating to the court that there is no genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary

judgment, may not rest on the allegations averred in his pleadings. *Id.* at 324. Rather, the non-moving party must demonstrate specific, material facts exist that give rise to a genuine issue. *Id.* Under this standard, the existence of a mere scintilla of evidence in support of the non-movant's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude granting the summary judgment motion. *Ross v. Commc'ns Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985), overruled on other grounds, 490 U.S. 228 (1989). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

III.    DOT's Motion for Summary Judgment

Plaintiff brings Title VII claims for race discrimination and retaliation against DOT. Plaintiff describes her case as concerning "wage based race discrimination, the involuntary transfer of the plaintiff, and other disparate and retaliatory treatment with regard to the terms and conditions of Plaintiff's employment." Pl. Mem. 1, ECF No. 46. DOT argues that almost all of Plaintiff's non-wage-based claims are time-barred[10] and any non-time-barred claims fail as a matter of law pursuant to Rule 56. *See* Def.'s Mem. 10. Plaintiff concedes that, except for her claim concerning her December 2010 move to a cubicle, her non-wage-based claims occurred more than 300 days "before she initiated and filed her formal charge of discrimination." Pl. Mem. 17. She submits, however, that DOT's untimeliness defenses are "susceptible to equitable counter-arguments." *Id.* On Reply, DOT argues Plaintiff is not entitled to the equitable relief from the limitations defense that she seeks. DOT Reply, ECF No. 50. The court examines the timeliness issue first.

A.    Timeliness of Plaintiff's non-wage-based Title VII Claims

---

[10] As discussed within, Lilly Ledbetter Fair Pay Act of 2009, 42 U.S.C. § 2000e-5(e)(3)(A), makes a different limitations analysis applicable to wage-based Title VII claims.

Before filing suit under Title VII, a plaintiff must exhaust her administrative remedies by filing a charge with the EEOC. *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 247 (4th Cir. 2000) (citing *King v. Seaboard Coast Line R.R. Co.*, 538 F.2d 581, 583 (4th Cir.1976)). When making South Carolina claims, in most situations the charge must be filed within 300 days after an "alleged unlawful employment practice" occurred. 42 U.S.C. § 2000e–5(e)(1); *Jones v. Calvert Group, Ltd.*, 551 F.3d 297, 300 (4th Cir. 2009) (citing *Tinsley v. First Union Nat'l Bank*, 155 F.3d 435, 439 (4th Cir. 1998)). The failure to file a timely charge with the EEOC bars the claim in federal court. *McCullough v. Branch Banking & Trust Co.*, 35 F.3d 127, 131 (4th Cir. 1994) ("When the plaintiff fails to file such a complaint in a timely fashion with the EEOC, the claim is time-barred in federal court.").

Failure to file a Title VII claim in a timely manner, however, is not jurisdictional. *See, e.g., Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982) (noting that "filing a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling"). The Fourth Circuit Court of Appeals has admonished that the equitable exceptions to the statutory limitations period "should be sparingly applied, however." *English v. Pabst Brewing Co.*, 828 F.2d 1047, 1049 (4th Cir. 1987) (in employment case alleging age discrimination). As the court explained, "The certainty and repose these [limitations] provisions confer will be lost if their application is up for grabs in every case." *Id.* As DOT appropriately notes, the doctrines of equitable estoppel and equitable tolling are distinct. DOT's Reply 2-3 (citing *English*, 849 F.2d at 1049). As the court explained:

> The doctrines of equitable tolling and equitable estoppel have a common origin; they are based primarily on the view that a defendant should not be permitted to escape liability by engaging in misconduct that prevents the plaintiff from filing his or her claim on time. As the Supreme Court explained in *Glus v. Brooklyn Eastern District Terminal,* 359 U.S. 231, 232–33 (1959),
>
> > [N]o man may take advantage of his own wrong. Deeply rooted in our jurisprudence this principle has been applied in many diverse classes of cases by both law and equity courts and has frequently been employed to bar inequitable reliance on statutes of limitations.

> **Equitable tolling applies where the defendant has wrongfully deceived or misled the plaintiff in order to conceal the existence of a cause of action.** *See Lawson v. Burlington Indus.,* 683 F.2d 862, 864 (4th Cir. 1982); *Cerbone v. Int'l Ladies' Garment Workers' Union,* 768 F.2d 45, 48 (2d Cir. 1985); *Meyer v. Riegel Prods. Corp.,* 720 F.2d 303, 307–08 (3d Cir. 1983). To invoke equitable tolling, the plaintiff must therefore show that the defendant attempted to mislead him and that the plaintiff reasonably relied on the misrepresentation by neglecting to file a timely charge. *Lawson,* 683 F.2d at 864; *Coke v. Gen. Adjustment Bureau,* 640 F.2d 584, 595 (5th Cir. 1981).

> **Equitable estoppel applies where, despite the plaintiff's knowledge of the facts, the defendant engages in intentional misconduct to cause the plaintiff to miss the filing deadline.** *Felty v. Graves-Humphreys,* 818 F.2d 1126 (4th Cir. 1987); *Price [v. Litton Bus. Syst., Inc.,* 694 F.2d [963] at 965 [(4th Cir. 1982)]. *See also Cerbone,* 768 F.2d at 49–50; *Dillman v. Combustion Eng'g,* 784 F.2d 57, 60–61 (2d Cir. 1986). "The statute of limitations will not be tolled on the basis of equitable estoppel unless the employee's failure to file in timely fashion is the consequence either of a deliberate design by the employer or of actions that the employer should unmistakably have understood would cause the employee to delay filing his charge." *Price,* 694 F.2d at 965.

*English*, 828 F.2d at 1049 (emphasis added). In other words, "[e]quitable tolling focuses on the plaintiff's excusable ignorance of the employer's discriminatory act. Equitable estoppel, in contrast, examines the defendant's conduct and the extent to which the plaintiff has been induced to refrain from exercising his rights." *Felty*, 785 F.2d at 519 (footnote and citation omitted).

Plaintiff argues her use of DOT's internal procedures should be considered in evaluating the arguments concerning timeliness and equitable relief from limitations periods. The court considers these facts and inferences to be drawn therefrom in the light most favorable to Plaintiff. *See Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979). Plaintiff contends that DOT "lulled her into inaction" because she "made use of the internal complaint mechanisms at [DOT] to redress the actions complained of here from the summer of 2009 until June 1, 2011." Pl. Mem. 19. Plaintiff first complained about her salary in the summer through the fall of 2009 to her then-supervisor Defendant Parnell. *See* ECF No. 46-7 (Oct. 7, 2009 email from Plaintiff to Parnell referencing question of salary equity and responsibility in July 2009). In response to that email, Defendant Parnell advised Plaintiff that he would "look into this." *Id.* When Plaintiff followed up on October 22, 2009, Defendant Parnell responded, "I am working on something. Just be patient." *Id.*

Plaintiff also points to the deposition testimony of HR Director Monts-Chamblee, and of Defendants Watson, Eargle, and Parnell as demonstrating her continued use of internal mechanisms to "redress her concerns about unfair pay and other discrimination," as evidence she had been "led [] to believe they were working to redress the same." Pl. Mem. 6 (citing Monts-Chamblee Dep. 16-17; Watson Dep. 22; Eargle Dep. 29; Parnell Dep. 25; Walsh Dep. 23). Review of these cited excerpts indicates Ms. Monts-Chamblee recalls speaking with Plaintiff between the spring of 2010 and spring of 2011 regarding concerns about her "work area and how she was being treated," her "relationship with Mr. Eargle in general," and her salary. Monts-Chamblee Dep. 16-18, ECF No. 46-2. Defendant Watson recalled Plaintiff had made complaints about the lack of space after she had moved (no time indicated). Watson Dep. 22, ECF No. 46-3. Eargle recalled Plaintiff's speaking with him about a salary equity analysis at some time after she began reporting to him. Eargle Dep. 29, ECF No. 46-4. When Plaintiff approached Defendant Parnell "around 2008, 2009 and asked for a salary increase," he advised her he "would look into it[.]" Parnell Dep. 25, ECF No. 46-5. Defendant Walsh recalled Plaintiff's having come to him with "a couple of concerns," although he did not recall specifics. Walsh Dep. 23, ECF No. 46-6.

In addition, Plaintiff points to a May 25, 2011 email exchange with Monts-Chamblee. ECF No. 46-13. Early that day, Plaintiff emailed Ms. Monts-Chamblee inquiring as to the appropriate procedure for sending HR a memorandum in response to Defendant  Eargle's not wanting to approve her attendance at a "CPM class." *Id.* After telling Plaintiff how to forward the memorandum to HR, Monts-Chamblee ended the email by asking Plaintiff, "How are you?". Plaintiff responded that she was doing "[o]kay for the moment" but expected the "day to get awkward" once Defendant Eargle received a copy of the memorandum. *Id.* Several hours later, Ms. Monts-Chamblee responded to Plaintiff, "Hang in." *Id.* On June 1, 2011, upon returning to work "after some extended time off," Plaintiff indicated she was following up with Ms. Monts-Chamblee to find out "what has happened or what has been discussed" about her "situation." ECF No. 46-13. Plaintiff indicated she was following

10

up as previously instructed by Ms. Monts-Chamblee. Plaintiff ended the email by asking what her next course of action was and noting she had placed a confidential envelope in HR to be opened by Ms. Monts-Chamblee only. *Id.* This was the final email in this May 25, 2011 email chain provided by Plaintiff.

As an initial matter, the undersigned notes that nothing in the email exchange between Plaintiff and Defendant Parnell indicates their communication related to anything other than her claims of wage inequity. *See* ECF No. 46-7. DOT does not argue such claims are time-barred, begging the question of whether these exchanges need even be considered in evaluating Plaintiff's equitable challenges as to her other claims. Further, the email chain in which Ms. Monts-Chamblee told Plaintiff to "hang in" is focused on a memorandum regarding Defendant Eargle's apparent nonapproval of Plaintiff's attendance at a "CPM class." ECF No. 46-13. Nothing referenced by either party indicates this exchange concerns a specific complaint that is tied to any race-based, non-salary-related Title VII violation.

Nonetheless, to consider Plaintiff's argument and inferences in the light most favorable to her, the court evaluates all evidence Plaintiff has presented on this point in considering her quest for equitable relief from the 300-day limitations period. Even so, the undersigned is of the opinion that Plaintiff has not shown she is entitled to the equitable relief she seeks.

Plaintiff argues generally that the above-referenced evidence sufficiently demonstrated that DOT's conduct "lulled her into inaction." Pl. Mem. 19. In particular, Plaintiff focuses on Defendant Parnell's October 22, 2009 email telling her to "be patient" and that he was "working on something," ECF No. 46-7, and Ms. Monts-Chamblee's May 25, 2011 comment that Plaintiff should "hang in," ECF No. 46-13. *See* Pl. Mem. 19. Nothing in the "be patient" or "hang in" emails indicates DOT was intentionally trying to mislead Plaintiff to conceal a potential action. As the Supreme Court of the United States explained in a case quoted by Plaintiff, equitable tolling may be appropriate when, among other reasons, "affirmative misconduct on the part of a defendant lulled the plaintiff into

inaction." *Baldwin Cnty. Welcome Ctr. v. Brown*, 466 U.S. 147, 151 (1984). Plaintiff submits she was "lulled into inaction" by DOT's conduct while she pursued internal remedies. Pl. Mem. 19. The statements referenced, she argues, "proved disingenuous," and reasonably lulled Plaintiff into waiting for internal procedures to run. *Id.* Despite Plaintiff's bald assertions to the contrary, she has not demonstrated "affirmative misconduct" on the part of DOT sufficient to entitle her to equitable tolling. Again, "[e]quitable tolling is a 'narrow limitations exception' that is to be used sparingly. *Belton v. City of Charlotte*, 175 F. App'x 641, 653 (4th Cir. 2006) (citing *Olson v. Mobil Oil Corp.,* 904 F.2d 198, 201 (4th Cir. 1990) (*en banc*)). Equitable tolling may be applied only when an employer has "'wrongfully deceived or misled the plaintiff in order to conceal the existence of the cause of action.'" *Olson,* 904 F.2d at 201 (quoting *English,* 828 F.2d at 1049). Plaintiff has provided no evidence to demonstrate a deliberate design on the part of DOT, nor has she established DOT should have known through its actions that Plaintiff would delay in submitting a charge to SHAC or the EEOC. Equitable tolling is inappropriate on these facts.

Further, regarding Plaintiff's interaction with Ms. Monts-Chamblee, Plaintiff testified that she first reported what she perceived as race discrimination to Ms. Monts-Chamblee in August of 2010 when she told Ms. Monts-Chamblee that she believed that her reassignment from Contracts Administrator to Professional Services Manager was motivated by her race. Ms. Monts-Chamblee told Plaintiff that she would "investigate and talk to [Plaintiff's] supervisors or whoever was in charge at that time to try and figure out what was going on." Pl. Dep. 161. According to Plaintiff, she never got any definitive answer from Ms. Monts-Chamblee—only that Ms. Monts-Chamblee "was still studying the case." Pl. Dep. 162. Considering Plaintiff's own testimony, then, she has not offered facts concerning interactions with Ms. Monts-Chamblee of HR that would support equitable tolling. That Plaintiff stated in August 2010 that she believed her transfer had been done because of her race makes it clear that Plaintiff was aware she had a potential Title VII claim before meeting with Ms. Monts-Chamblee in August 2010. She filed her charge more than 300 days later, on August 26, 2011. Ms.

Monts-Chamblee did not "wrongfully deceive or mislead the plaintiff in order to conceal the existence of a cause of action." *English*, 828 F.2d at 1049. Although Ms. Monts-Chamblee arguably gave Plaintiff hope that her concerns about her reassignment and pay would be resolved administratively, Plaintiff's testimony that she believed that she was the victim of race discrimination and so informed Ms. Monts-Chamblee in August 2010 conclusively refutes any argument that anything Ms. Monts-Chamblee did or failed to do operated to conceal from Plaintiff her right to assert a claim of race discrimination. *See Felty*, 785 F.2d at 519 (noting equitable tolling "focuses on the plaintiff's excusable ignorance of the employer's discriminatory act"); *Belton v. City of Charlotte*, 175 F. App'x at 654 (finding equitable tolling not warranted when plaintiff testified he believed he had been discriminated against because of his race as soon as white competitor for promotion was selected); *Mascheroni v. Bd. of Regents of Univ. of Cal.*, 28 F.3d 1554, 1562-63 (10th Cir. 1993) ("Comments by . . . the human resources department may have given [plaintiff] false hope that his problems could be resolved internally, but they do not rise to the level of active deception about the procedures for filing a Title VII claim" required to establish equitable tolling).

Similarly, Plaintiff has not shown she is entitled to equitable estoppel as she has not shown "intentional misconduct" on the part of DOT to cause Plaintiff to miss a filing deadline. *See English*, 828 F.2d at 1049. In addition, to the extent Plaintiff argues she is entitled to relief from the limitations period because she was pursuing internal remedies, such an argument is unavailing. An employer's "promise to investigate does not by itself qualify as deliberate deception" for purposes of considering whether an employer should be equitably estopped from asserting a Title VII limitations period. *Belton*, 175 F. App'x at 654. *See also Lucas v. Chicago Transit Auth.*, 367 F.3d 714, 721-22 (7th Cir. 2004) (holding employer's internal review is not by itself "an active step" that warrants application of equitable estoppel); *Lever v. Northwestern Univ.*, 979 F.2d 552, 556 (7th Cir. 1992) ("[An employer's] many and varied opportunities for internal review is not the sort of deception that supports equitable estoppel.").

Similarly unavailing is Plaintiff's argument that Defendant Parnell's indication to Plaintiff that he was "working on" a salary analysis was "untruthful." *See* Pl. Mem. 6. In support of that argument, Plaintiff cites to testimony from Ms. Monts-Chamblee that Defendant Parnell and others in Plaintiff's chain of command "were not qualified to perform a salary analysis without human resources['] approval[,] which they did not seek." *Id.* However, the cited testimony of Ms. Monts-Chamblee indicates only that Defendant Parnell and others in Plaintiff's chain of command would not "typically have the tools they needed" to perform a full salary analysis. Monts-Chamblee Dep. 48. Ms. Monts-Chamblee did note that no one had come to her for a salary analysis, but she also noted she could not confirm what Defendant Parnell meant by indicating he was "working on" something. *Id.* While it is true that facts are to be considered in the light most favorable to Plaintiff here, that does not somehow require the court to agree with Plaintiff's argument that Defendant Parnell's representation was actually "untruthful." Indeed, the pages of the Monts-Chamblee deposition provided to the court include a question to Ms. Monts-Chamblee that begins, "But you cannot say whether or not that's a mischaracterization or a lie, 'I am working on . . . .'" Monts-Chamblee Dep. 48, ECF No. 46-2. However, Plaintiff did not provide the following page on which the witness may (or may not) have responded to that query. In any event, the court has not been asked to consider equitable tolling or equitable estoppel as to the wage-based portion of Plaintiff's claim. Even if it were so considering, case law is clear that a plaintiff's use of internal procedures does not excuse her timely filing of a Title VII claim. In sum, Plaintiff's resort to internal DOT processes to question or challenge employment decisions that she regarded as discriminatory does not excuse her untimely filing under either equitable tolling or equitable estoppel.

Based on this recommendation, Plaintiff's discrimination claims that are not wage-based and that occurred more than 300 days before August 26, 2011 are time-barred and need not be considered on their merits. The charge was filed on August 26, 2011, making non-waged-based occurrences that took place prior to October 30, 2010 untimely. These time-barred claims concern Plaintiff's December

2, 2009 reassignment from Contracts Administration to Professional Services; her July 28, 2010 reassignment from Engineering-Construction to Engineering-Operations; her replacement as Contracts Administrator by Susie Lominick Bender on December 2, 2009, and/or her failure to be reassigned back to that position; and her move in late 2009 from a relatively larger office in Contracts Administration to a relatively smaller office following her reassignment from Contracts Administration to Professional Services. This arguably leaves one non-wage-based claim at issue—Plaintiff's transfer from a private office to a cubicle. In her deposition, Plaintiff testifies that she was moved from office to cubicle in December of 2010, Pl. Mem. 142, which was within 300 days of Plaintiff's August 2011 filing.[11]

B.  Non-time-barred Title VII Claims

1.  Employment Actions, Generally

Plaintiff may attempt to avert DOT's summary judgment motion and establish her remaining Title VII claims through two avenues of proof. *See Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 318 (4th Cir. 2005); *see also Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004). A plaintiff can survive a motion for summary judgment by presenting direct or circumstantial evidence that raises a genuine issue of material fact as to whether an impermissible factor such as race or gender motivated the employer's adverse employment decision. *Diamond*, 416 F.3d at 318. Pursuant to the 1991 Civil Rights Act, the impermissible factor need not have been the sole factor. As long as it motivated the adverse action, the plaintiff can establish an unlawful employment practice. *See* 42 U.S.C.A. § 2000e–2(m). A case involving proof of this nature is often referred to as a "mixed motive" case. In this type of case, if the employer can demonstrate that it would have taken the same action in the absence of the impermissible motivating factor, the employee's

---

[11] DOT points to a different page of Plaintiff's deposition as indicating Plaintiff moved to a cubicle in October of 2010, which would make that claim untimely. *See* DOT's Mem. 15 (citing Pl. Dep. 155). At this stage, the court must construe all facts in the light most favorable to Plaintiff, so the December 2010 date will be used and this portion of Plaintiff's non-wage-based claims are considered on the merits within.

damages are restricted to injunctive and declaratory relief, and attorneys' fees and costs. *Diamond*, 416 F.3d at 318.

Alternatively, a plaintiff may establish his or her case using the *McDonnell Douglas* burden-shifting/"pretext" framework, under which the employee must first establish a prima facie case of discrimination and then demonstrate the employer's "proffered permissible reason for taking an adverse employment action is actually a pretext for discrimination." *Hill*, 354 F.3d at 285. The final pretext inquiry "merges with the ultimate burden of persuading the court that the plaintiff has been the victim of intentional discrimination, which at all times remains with the plaintiff." *Merritt v. Old Dominion Freight Line, Inc.,* 601 F.3d 289, 294 (4th Cir. 2010). Under either analysis, however, plaintiffs are required to submit evidence to demonstrate that the defendant's adverse employment decision was motivated by their race. *Diamond*, 416 F.3d at 318.

In establishing this pretext framework, the Supreme Court explained that the "broad, overriding interest" of Title VII, "shared by employer, employee, and consumer, is efficient and trustworthy workmanship assured through fair and racially neutral employment and personnel decisions." *McDonnell Douglas,* 411 U.S. at 801. The pretext framework advances that interest by "compensat[ing] for the fact that direct evidence of intentional discrimination is hard to come by." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 490 U.S. 271 (1989) (O'Connor, J., concurring in the judgment) (superseded by statute on other grounds). As the Fourth Circuit has explained:

> The Supreme Court constructed the elements of the prima facie case to give plaintiffs who lack direct evidence a method for raising an inference of discrimination. *See Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253-54 (1981); *Costa [v. Desert Palace,* 299 F.3d [838] at 855 (9th Cir. 2002) (*en banc*) (j'ment aff'd 539 U.S. 90 (2003))]. But, once an employer rebuts the prima facie case with a legitimate, nondiscriminatory reason for the employment action, "the *McDonnell Douglas* framework-with its presumptions and burdens-disappear[s], and the sole remaining issue [is] discrimination *vel non.*" *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142-43 (2000) (internal quotation marks and citations omitted). Thus, in Title VII cases, the "prima facie case," a mechanism peculiar to the pretext framework, is never by itself sufficient to permit a plaintiff to escape an adverse summary judgment ruling except in the rare instance when an "employer is silent in the face of the presumption" it raises. *See Burdine,* 450 U.S. at 254. Even then, of course, as in every employment

16

discrimination case alleging disparate treatment, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.* at 253.

*Diamond*, 416 F.3d at 318-19 (footnotes omitted).

2. Plaintiff's Wage-Based Title VII Claim

Plaintiff alleges a Title VII discrimination claim, alleging disparate treatment based on unequal pay. Plaintiff claims she was discriminated against on account of her race because her salary was $16,000/year lower than that of Wendy Hollingsworth, a white employee performing comparable duties. *See* Pl. Dep. 191-92; SHAC Wages Questionnaire 3, ECF No. 43-3 at 163 (listing Hollingsworth as employee paid more who is of different race). The parties agree that, based on the Ledbetter Act, Plaintiff's wage-based claims are to be considered timely. In relevant part, the Ledbetter Act provides:

> an unlawful employment practice occurs, with respect to discrimination in compensation in violation of [Title VII], when a discriminatory compensation decision or other practice is adopted, when an individual becomes subject to a discriminatory compensation decision or other practice, or when an individual is affected by application of a discriminatory compensation decision or other practice, including each time wages, benefits, or other compensation is paid, resulting in whole or in part from such a decision or other practice.

42 U.S.C. § 2000e–5(e)(3)(A). Under the Ledbetter Act, a Title VII claim accrues with each paycheck issued pursuant to an allegedly discriminatory decision or other practice. The Act is "directed toward situations such as unequal pay for equal work." *Spraker v. RTG Furniture of Ga.*, C/A No. 6:11-3517-MGL, 2013 WL 3804075 (D.S.C. July 19, 2013).

DOT seeks summary judgment, arguing Plaintiff's claim of wage-based discrimination fails as a matter of law on the undisputed facts. In analyzing Plaintiff's wage-discrimination claim, DOT assumes Plaintiff is proceeding using the "indirect" method of proof available under the *McDonnell Douglas* framework. DOT Mem. 8-9. DOT argues Plaintiff cannot establish a prima facie case of race discrimination and, even if she could, she has not demonstrated pretext evidence sufficient to avoid summary judgment. DOT Mem. 18-23. In response, Plaintiff argues she can defeat summary judgment

using either the "direct"/mixed-motive method of proof or the indirect (*McDonnell Douglas*) method and framework. Pl. Mem. 11-17. In reply, DOT reiterates its arguments using the *McDonnell Douglas* framework; it does not address Plaintiff's direct-proof argument. The court will consider Plaintiff's mixed-motive case argument after considering the case under the *McDonnell Douglas* burden-shifting framework that was briefed by both parties.

a) *McDonnell Douglas* Analysis

In proceeding under the *McDonnell Douglas* burden-shifting framework, Plaintiff must first make out a prima facie case of pay discrimination under Title VII. To do so, Plaintiff "must show that [s]he (1) is a member of a protected class; (2) was as qualified as other employees not of the protected class; and (3) was paid less than similarly situated employees who were outside h[er] protected class." *Woodward v. United Parcel Service, Inc.*, 306 F. Supp. 2d 567, 574-75 (D.S.C. 2004). Regarding comparators, Plaintiff "must prove that the comparators upon whom [s]he relies are similarly situated 'in all relevant respects.'" *Id.* at 575 (quoting *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997)).

DOT argues Plaintiff cannot establish a prima facie case of discrimination based on her wages. It is undisputed that Ms. Hollingsworth and Plaintiff both have "Program Manager I, band 7" classifications and that Ms. Hollingsworth's annual salary is $16,000 higher than Plaintiff's. However, DOT argues the court should consider comparators in addition to Ms. Hollingsworth. When the additional comparators are considered, DOT submits Plaintiff cannot establish her prima facie case.

DOT provides evidence concerning other would-be comparators, noting that, as of August 2011 (when Plaintiff filed her charge of discrimination), the three DOT employees in the position of Program Manager I with the highest salaries were African Americans earning salaries of $86,972 (Vivian Patterson), $82,930 (Keith Melvin), and $78,566 (Paula Hollis). At that time, the authorized salary range for Program Manager I started at approximately $45,000 and extended to more than $80,000. *See* Monts-Chamblee Dep. 92-96 and Def. Ex. 7 thereto; ECF No. 43-4 at 26-30 & 57. DOT also proffers evidence that, of the ten highest paid in the position of Program Manager I, five are

African American and five are white. Watson Dep. 40-44 and Pl. Ex. 9 thereto; ECF No. 43-5. When considering these comparators, DOT submits Plaintiff cannot satisfy the third prong of her prima facie case—that she was paid less than similarly situated employees outside her class. DOT Mem. 20-23.[12]

Having examined the parties' arguments, the undersigned is of the opinion that, based on the facts of this case and giving Plaintiff every benefit of the doubt, Ms. Hollingsworth is the sole appropriate comparator. Plaintiff has provided sufficient detail regarding Ms. Hollingsworth, whom DOT's own Ms. Monts-Chamblee acknowledged would be Plaintiff's most comparable employee. Monts-Chamblee Dep. 55, ECF No. 46-2. As Plaintiff points out, in considering whether comparators are similarly situated for purposes of establishing a prima facie case, the law in this court requires that comparators be substantially similar in relevant respects, often including being subject to the same supervisor and being subject to the same standards for the same job. *See* Pl. Mem. 12-13; *see Ward v. City of N. Myrtle Beach*, 457 F. Supp. 2d 625, 643 (D.S.C. 2006).The undersigned is of the opinion that *Woodward* and other cases cited by DOT do not require a different result. In *Woodward*, the court also noted that "[i]n cases where there are multiple comparators, identification of only a single comparator not in the protected class [who was] paid more than the plaintiff may not be sufficient to establish a prima facie case." 306 F. Supp. 2d at 575 (citing *Houck v. Polytechnic Inst. & St. Univ.*, 10 F.3d 204, 206-07 (4th Cir. 1993)). However, the situation before the court in *Woodward* was distinguishable from the facts before the court here. In *Woodward*, plaintiff alleged that, while a "Grade 16" employee, he did not progress to the middle of that position's salary range "as quickly as white employees" and that he "received lower annual raises" than such employees. 306 F. Supp. 2d at 574. In finding plaintiff had not established a prima facie case in his Title VII wage claim, the court found plaintiff had not identified "any relevant group of similarly situated comparators," *id.* at 575, nor does it appear plaintiff offered specific information as to a particular similarly situated comparator.

---

[12] DOT also submits a comparison of the pay and salary increases received by Plaintiff and by Ms. Hollingsworth, which the court discusses within.

The court notes that, in the *Woodward* decision, the court found it "misleading" that the plaintiff had wrongly focused "only on a sub-set of the potential body of comparators." 306 F. Supp. 2d at 576. Based on the facts before the court in this matter, though, the court is persuaded that Ms. Hollingsworth is the most appropriate comparator, making it appropriate to focus only on her. Indeed, Ms. Hollingsworth is the focus of many aspects of Plaintiff's Title VII claims, and Plaintiff has provided sufficient evidence to establish her as the appropriate comparator for this wage-based Title VII claim.

When identifying additional potential comparators, DOT also noted there was a broad (greater than $35,000) range of salaries within the Program Manager I job classification. Further, nothing in the record cited to by DOT provides detail of what level within Program Manager I the other employees were at the time that salary-snapshot was taken, nor does DOT provide information regarding these proffered comparators' job duties, locations, experience, education, or who their supervisors were.

The court is mindful that Plaintiff bears the burden of establishing her prima facie case and finds she has done so here. The information DOT has provided regarding its additional would-be comparators does not tip the scale in DOT's favor. Nor does the argument DOT makes on Reply based solely on Plaintiff's own deposition testimony persuade the court to consider this larger segment of comparators. *See* DOT Reply 9 (citing Pl. Dep. 120-29, 163-66, ECF No. 50-2). It is true that Plaintiff testified she did not necessarily consider Ms. Hollingsworth her only comparator and she looked at Program Manager I employees "across the board." Pl. Dep. 163-64. However, Plaintiff also testified that, in initially considering her claim, she had reviewed salary information available on the State of South Carolina's website and noted there were other Program Manager I employees whom she "considered in the same line of work" as she. *Id.* at 120-21. In any event, the determination of appropriate comparators in considering a prima facie case is one for the court to make in this instance. Plaintiff's case is not to be determined here, as a matter of law, based on her lay testimony of who her

comparators may or may not be. *See generally Young v. Lehman*, 748 F.2d 194, 197 (4th Cir. 1984) (noting burden of establishing prima facie case is "not a heavy one").

Accordingly, the undersigned is of the opinion that Plaintiff has satisfied each element of her prima facie case as to her Title VII race-based wage claim.[13] That, of course, does not end the analysis.

b)  Pretext Analysis

Pursuant to the *McDonnell Douglas* burden-shifting framework, the court must now consider whether DOT has satisfied its burden of producing evidence of a legitimate, nondiscriminatory reason for its employment action. *Merritt*, 601 F.3d at 294. If it has, the burden will then return to Plaintiff to demonstrate by a preponderance of the evidence that the proffered reason was "not its true reason[ ], but [was] a pretext." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

DOT provides the following explanation[14] setting out the nondiscriminatory reasons for the difference in the salaries of Plaintiff and Ms. Hollingsworth:

> The difference between Ms. Hollingsworth's and Plaintiff's salaries predate 2009, when Ms. Hollingsworth first transferred into the Engineering Division, and are explainable based on non-race factors, including how each woman progressed to her current Program Manager I classification and band 7 pay band.
> [] Plaintiff returned to employment with DOT in 2000 after a 4-year hiatus in the private sector. When she returned, she was hired as a Procurement Specialist II, pay band 5, at an annual salary of $34,117. Between 2000 and 2006, she received cost-of-living increases every year the General Assembly authorized them, one merit increase, and two additional skills increases. As a result, immediately preceding her reclassification to her current Program Manager I, band 7 position in November 2006, Plaintiff's annual salary was $45,381. Upon her reclassification to Program Manager I, she advanced from pay band 5 to pay band 7 and received a 27% salary increase, from $45,381 to $57,838 annually. Since her reclassification to the Program Manager I, band 7 position she now holds, Plaintiff has received cost-of-living increases authorized by the General Assembly. Her current salary is $61,973. [Monts-Chamblee Dep. 79 and D. Ex. 4] [ECF No. 43-4].
> Wendy Hollingsworth began her employment with DOT in February 1992 and has been employed continuously since that time. Until February 2009, she was assigned

---

[13]  DOT is correct in noting this is not a claim brought under the Equal Pay Act ("EPA"), which has different criteria and requires a different analysis. *See* DOT's Mem. 20.

[14]  Although DOT presented this evidence in arguing Plaintiff could not establish a prima facie case, it appropriately may be considered here. *See generally Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 516 (4th Cir. 2006) (noting flexibility of *McDonnell Douglas* framework and finding "no impermeable barrier" preventing parties from using the same evidence at different stages of the framework).

to a different division of DOT than Plaintiff and had a different chain of command. [Pl. Dep. 37-41; 55; 127-34] [ECF No. 43-3]. In July 1996, Ms. Hollingsworth was reclassified to a Grants Coordinator II, band 5 position, at an annual salary of $26,374. Over the next several years, she received cost-of-living increases along with an additional duties increase and a performance increase so that in September of 1999, her annual salary was $36,725. On September 17, 1999, she was reclassified to the position of Auditor IV, band 6, and received a 14% salary increase to $41,716. In 2000, when Plaintiff returned to employment with DOT as a Procurement Specialist II, band 5 at an annual salary of $34,117, Ms. Hollingsworth was an Auditor IV, band 6, earning $45,291. That is, she was already making $11,000 a year more than Plaintiff. Between February 2000 and February 2, 2007, Ms. Hollingsworth received cost-of-living increases, two merit increases, and three additional skills and one additional duties increases. When she was reclassified to Program Manager I, band 7, on February 2, 2007, Ms. Hollingsworth's annual salary was $63,877. Upon reclassification, she received an 8% increase to $68,987. Since being reclassified to Program Manager I, Ms. Hollingsworth received one additional duties increase in 2008, while she was still in a different division from Plaintiff, and the cost-of-living increases received by all state employees. Her current salary is $78,354. [Monts-Chamblee Dep. 77 and D. Ex. 3].

DOT Mem. 18-19. DOT notes that both Plaintiff and Ms. Hollingsworth are classified as a Program Manager I and do the same type of work. DOT Mem. 20. However, DOT submits the salary difference "is due not to race but to these women's respective employment and salary histories prior to February 2009, when, for the first time in their DOT careers, they were assigned to work in the same division of DOT, Engineering, under the same manager." DOT Mem. 20 (citing Monts-Chamblee Dep. 60-64; 68-69; 76-100; 103-05; and Defs.' Exhs. 1-7 to Monts-Chamblee Dep).

In response, Plaintiff seems to argue that DOT's proffered reason for the pay difference between Plaintiff and Ms. Hollingsworth is pretextual "fosters a legal absurdity" in that the reason offered relates to the relative salary histories of the two. Pl. Mem. 15-16 ("Here, [DOT's] articulated non-discriminatory reason for underpayment fosters a legal absurdity; wherein [DOT] asserts that even if Ms. Hollingsworth were Plaintiff's only valid comparator [], Plaintiff cannot file an action against her due to historical underpayment between the two.") Citing 42 U.S.C. § 2000e-5(e)(3)(A), Plaintiff submits that DOT's position "implicitly, if not explicitly, conflicts with the Lilly Ledbetter Fair Pay Act of 2009." Pl. Mem. 15. Although not completely clear, Plaintiff seems to argue that the Ledbetter Act is intended to prevent an employer defending a Title VII wage-based discrimination claim from

presenting any historical payment data and that a historical payment differential between two employees can never be a valid, nondiscriminatory reason for a difference between salaries. Pl. Mem. 15.

Accordingly, Plaintiff submits she has presented evidence sufficient to permit a jury to disbelieve DOT's nondiscriminatory reason for the pay differential. *Id.* Citing generally to the "Facts" section of her memorandum, Plaintiff submits she has put forth sufficient substantial evidence "from which a reasonable jury could conclude that the Plaintiff's underpayment was racially motivated, and that Defendant's asserted legitimate, non-discriminatory reason for termination[15] was pretext and should be disbelieved." Pl. Mem. 16-17.

The court is unpersuaded. Plaintiff's rhetoric offers little by way of specific, substantive argument as to how she can demonstrate DOT's stated reasons for the distinction in the salaries of Plaintiff and Ms. Hollingsworth are merely pretextual.

To the extent Plaintiff argues the intent behind the Ledbetter Act is to prevent parties from presenting and the court from considering evidence of historical salaries in examining wage-based claims, her argument misses the mark. The Ledbetter Act's purpose is to prevent plaintiffs from being hamstrung by statutes of limitations when considering employees' "historical" wages. As explained by one court, the express purpose of the Ledbetter Act was "to reinstate the law regarding the timeliness of pay compensation claims as it was prior to the *Ledbetter* [Supreme Court] decision, which Congress believed undermined statutory protections against compensation discrimination by *unduly restricting the time period* in which victims could challenge and recover for discriminatory compensation decisions." *Mikula v. Allegheny  Cnty. of Pa.,* 583 F.3d 181, 184 (3d Cir. 2009) (emphasis added).

Here, DOT has set forth a nondiscriminatory reason for the salary differential. The burden shifts back to Plaintiff to show that reason was merely pretextual. Plaintiff must present sufficient

---

[15] "Termination" is likely a scrivener's error, as Plaintiff still worked for DOT at the time Plaintiff filed her response.

evidence to create at least a genuine issue of fact that the reason Plaintiff and Ms. Hollingsworth were not paid the same salary was because Plaintiff is African American. *See, e.g., Riley v. Honeywell Tech. Solutions, Inc.*, 323 F. App'x 276, 277 (4th Cir. 2009) (affirming grant of summary judgment as to employee's failure-to-promote and wage claims because plaintiff had not established reasons proffered by employer for failure to promote or regarding difference in wages were pretextual, finding there was "utterly no evidence of racial animus" and distinctions between employees were "adequate to justify" wage differential). As this court noted in finding an employee had not established his employer's stated reason for a wage differential was merely pretextual, "'[T]he point of focus for the court is whether particular means of compensation in employment are discriminatory, racially discriminatory, and **that does not mean necessarily that because a particular black [employee] receives less money than a particular white [employee] that is in and of itself discriminatory under Title VII**, if that is the method by which that difference is applied across the board and uniformly as to both whites and blacks.'" *Thomas v. Univ. of S.C.*, No. 3:04-0632-MBS, 2006 WL 2543276, at *5 (D.S.C. Aug. 31, 2006) (quoting *Crowell v. Taft Broad. Co*., Nos. 76-0828, 75-1360, 1978 WL 4220, at *13 (N.D. Ala. Apr. 27, 1978) (emphasis added)).

Although not referenced in response to this portion of DOT's argument, Plaintiff sets forth some "facts" in the factual section that bear mentioning here. Plaintiff cites Ms. Monts-Chamblee's general testimony about pay bands at DOT and noted some permissible factors to be considered when justifying variances within pay bands and how salary equity analyses typically are conducted. Pl. Mem. 4 (citing Monts-Chamblee Dep. 35, 59,[16] 113-14; ECF No. 46-2). Particularly, citing pages 113-14 of Ms. Monts-Chamblee's deposition, Plaintiff submits Ms. Monts-Chamblee "answered affirmatively" when "asked whether Plaintiff was being paid unfairly in relation to Ms. Hollingsworth, with regard to state service, job service, and education[.]" Pl. Mem. 4. The record before the court does not include two of the cited deposition pages. However, review of the one available page, page 113,

---

[16] Plaintiff did not provide pages 59 or 114 of Ms. Monts-Chamblee's deposition transcript.

24

makes it clear that Ms. Monts-Chamblee did not testify that Plaintiff "was being paid unfairly in relation to Ms. Hollingsworth." In fact, after DOT's counsel objected to the form of the question asked, Ms. Monts-Chamblee explained that the question she was being asked took information out of context. Monts-Chamblee Dep. 113. Plaintiff suggests that, although the witness also testified there were other factors to be considered in setting salaries, the court should rely only on testimony to which Plaintiff refers and DOT's "own declaration about wages." *Id.* (citing Monts-Chamblee Dep. 35; and "Declaration," ECF No. 46-12).

Although Plaintiff is entitled to have all facts and reasonable inferences derived therefrom considered in her favor at this juncture, that review standard does not mean the court is to consider only isolated, potentially out-of-context lines in a deposition. As set out fully above, Monts-Chamblee provided a thorough account of Plaintiff's and Ms. Hollingsworth's salaries and how they were calculated, which DOT presented as a reasonable, nondiscriminatory reason for the salary differences. Plaintiff cannot establish that proffered reason is merely pretextual by citing to select lines of deposition testimony taken out of context. Plaintiff bears the burden of demonstrating DOT's proffered explanation for the salary differential was pretextual. *See Atkins v. Holder*, 529 F. App'x 318, 320 (4th Cir. 2013) (noting if a plaintiff puts forth a prima facie, defendant must offer a nondiscriminatory explanation for the termination and then the burden of proof returns to plaintiff to show the employer's proffered explanation is pretextual) (Title VII); *Yashenko v. Harrah's Casino*, 446 F.3d 541, 551 (4th Cir. 2005) (same in retaliatory discharge context). "Once an employer has provided a non-discriminatory explanation for its decision, the plaintiff cannot seek to expose that rationale as pretextual by focusing on minor discrepancies that do not cast doubt on the explanation's validity. . . ." *Hux v. City of Newport News, Va.*, 451 F.3d 311, 315 (4th Cir. 2006) (noting such points reveal no "genuine" issue of material fact). "[I]t is not [the court's] province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998). Here, Plaintiff has offered no evidence

that DOT's stated explanation for the difference between her salary and Ms. Hollingsworth's was pretextual. She has provided no evidence from which a reasonable juror could determine she was the victim of intentional discrimination. *Merritt*, 601 F.3d at 294.

Accordingly, the undersigned finds Plaintiff has not established an issue of fact as to whether DOT's proffered reasons for the pay differential between her and Ms. Hollingsworth are pretextual. DOT is entitled to summary judgment on the Title VII wage-based discrimination claim.

c) Mixed-motive ("Direct") Analysis

Plaintiff submits that the following circumstantial evidence combined provides evidence sufficient to survive summary judgment under the mixed-motive framework:

> (1) that she is paid [$]16,000 less per year than her nearest comparator who is nearly identical to her in all employment-related aspects, save race; (2) that she has been denied a salary equity analysis even though one was warranted; (3) that she continues to be denied a salary equity analysis even though the initial basis for such a denial is no longer applicable; (4) that she has been subjected to other disparate terms and conditions of employment, including her involuntary transfer.

Pl. Mem. 14. As further support of her mixed-motive analysis, Plaintiff has proffered the affidavits of a longtime employee and a longtime former employee of DOT as evidence "corroborating that there is a pattern and practice of racial discrimination by [DOT]."  Pl. Mem. 14-15; ECF Nos. 46-14 and 46-15 (Affidavits of Delores Davis Whack and Jeffery West). Plaintiff submits that this evidence, while circumstantial, combines to create a "convincing 'mosaic'" from which a jury could infer discriminatory intent. Pl. Mem. 13 (citing *Cason v. S.C. St. Ports Auth.*, No. 2:11-cv-2241-RMG, 2014 U.S. Dis. LEXIS 18708, p. 13 [2014 WL 588065] (D.S.C. Feb. 14, 2014)).[17]

---

[17] The undersigned notes that the *Cason* case considered the "mosaic" theory at the pretext phase. *Cason v. S.C. St. Ports Auth.,* No. 2:11-cv-2241-RMG, 2014 U.S. Dist. LEXIS 18708, *13 (D.S.C. Feb. 14, 2014). Further, at least one later case decided by another district judge in this court chose not to apply the "mosaic theory" to a failure-to-promote Title VII claim, noting the theory referenced in *Cason* derived from an opinion by the Seventh Circuit Court of Appeals, *see Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994), and is not binding in this Circuit or District. *See Harrison v. S.C. Dept. of Mental Health*, __ F. Supp. 3d. ___, C/A No. 3:12-cv-1754-JFA, 2014 WL 4700642, at *3 (D.S.C. Sept. 18, 2014).

The court is not persuaded. Plaintiff is correct that she can use combined circumstantial evidence in attempting to avert summary judgment outside of the *McDonnell Douglas* framework. *See Diamond*, 416 F.3d at 317. However, the evidence to which Plaintiff points does not suffice under a mixed-motive analysis.

As an initial matter, the undersigned agrees with DOT that the affidavits of other DOT employees should be disregarded as they provide only information concerning their own opinions, perceptions, and observations as to how black employees are treated in general. *See, e.g.*, Whack Aff., ECF No. 46-14, at 3 ("In my opinion, . . . I was denied the promotion because of race."); West Aff., ECF No. 46-15 at 1 ("[T]here is a sentiment, that I have perceived, at SCDOT that black employees should not be in a position of authority because they might impede practices of favoritism toward majority white outside contractors and consultants."). Rule 56(c)(4) of the Federal Rules of Civil Procedure requires that "[a]n affidavit . . . used to . . . oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated." These statements should not be considered. *See Lidge v. Mohawk ESV, Inc.*, No. CIVA 4:12-2205-MGL, 2014 WL 793061, at *15 (D.S.C. Feb. 25, 2014) (finding it inappropriate to consider inadmissible evidence from other employees to defeat summary judgment) (citing *Myers v. Wood,* C/A No. 0:12–cv–422–JFA, 2013 WL 4823171 (D.S.C. Sept. 9, 2013)). Further, even if otherwise admissible, to the extent Plaintiff submits these affidavits to "corroborat[e] that there is a pattern and practice of racial discrimination" by DOT, Pl. Mem. 14, they are not relevant to the issues presented in Plaintiff's case. "There is no private, non-class cause of action for 'pattern and practice' discrimination under Title VII in the Fourth Circuit." *Lott v. Westinghouse Savannah River Co., Inc.,* 200 F.R.D. 539, 553 (D.S.C. 2000). Even considering these affidavits for what they may be worth, they do not provide competent evidence regarding Plaintiff's treatment concerning her wage-based claims. In order to survive summary judgment, Plaintiff must demonstrate that her race was a motivating factor in determining her salary, even though other factors

may also have motivated her wages. *Diamond*, 416 F.3d at 317. For the reasons set forth above, Plaintiff has failed to provide any such evidence.[18] The evidence Plaintiff sets out concerning the salary equity analysis and "other discriminatory acts" does not demonstrate that her race was "an impermissible reason" for her pay being set where it was. *Diamond*, 416 F.3d at 317.

   d)  Discrimination: Cubicle Move

The court also considers the only non-wage-based claim that arguably is not time-barred: Plaintiff's move from a private office to a cubicle. Plaintiff argues that she was subjected to discrimination and retaliation by being moved from a private office to a cubicle surrounded by boxes of proposals. Pl. Dep. 155-56 & Def. Ex 3 thereto (SHAC Charge), ECF No. 43-3. Reading Plaintiff's deposition testimony and the SHAC Charge together, DOT argues that move took place on October 15, 2010, making it time-barred. DOT Mem. 15-16. DOT also acknowledges that, in a different portion of her deposition, Plaintiff testified that she was moved to the cubicle in December 2010. DOT Mem. 16 (citing Pl. Dep. 142-46). DOT concedes that, if the cubicle move took place in December 2010 it would not be time-barred. Rather, DOT argues the claim fails on its merits. DOT Mem. 16-18.

Considering the facts liberally in Plaintiff's favor,[19] the court considers the merits of Plaintiff's claim concerning her move to a cubicle. Plaintiff does not reference specific direct or circumstantial

---

[18] Plaintiff characterizes her wage-based claim as one of "discrimination," Pl. Mem. 11-14, never arguing the salary differential gives rise to a retaliation claim. To the extent she were to make such a claim, it fails as a matter of law. The explanation provided by Ms. Monts-Chamblee regarding the differences between the salaries of Plaintiff and Ms. Hollingsworth refutes any such claim, and Plaintiff cannot demonstrate that the stated reason is pretextual.

[19] The court accepts the latter of the two dates Plaintiff referenced regarding her cubicle move out of an abundance of caution. The undersigned is mindful of the general rule that a party cannot create an issue of fact merely by testifying to two versions of an event. *See generally Erwin v. United States*, 591 F.3d 313, 325 n.7 (4th Cir. 2010) (noting plaintiff could not create an issue of fact by providing a sworn declaration that directly contradicted her deposition testimony). Here, Plaintiff testified in her deposition that she was moved to a cubicle on "the other end of the hall" in December of 2010. Pl. Dep. 142. Later in the deposition, when asked about the date range of "on or about October 15, 2010 through on or about April 11, 2011, and continuing" that Plaintiff had referenced in her SHAC Charge, Plaintiff responded that events during this time span included having been moved to the cubicle and "just feeling like [she] was a nobody." Pl. Dep. 155-56. The court accepts the later date in construing facts in Plaintiff's favor for purposes of this Motion (rather than to create an issue of fact).

evidence in support of a mixed-motive method of proving this move was discriminatory or retaliatory. Accordingly, the court considers this discrimination claim under the familiar *McDonnell Douglas* proof scheme. To establish a prima facie case of race discrimination, Plaintiff must prove the following four elements: "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010).

DOT submits Plaintiff cannot establish a prima facie case of discrimination here because the move to a cubicle does not qualify as an "adverse employment action." DOT Mem. 15-17. The court agrees. As the Fourth Circuit has explained, "[a]n adverse employment action is a discriminatory act which adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment." *James v. Booz–Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004) (citation and internal quotation marks omitted). "Conduct short of 'ultimate employment decisions' can constitute adverse employment action," *id.* at 375-76, but "[a]n action that merely causes an employee irritation or inconvenience" does not qualify. *Spriggs v. Pub. Serv. Comm'n of Md.*, 197 F. Supp. 2d 388, 393 (D. Md. 2002).

Plaintiff counters DOT's argument by noting cases cited by DOT on this point are not governing and that Plaintiff should prevail on this point because she is "entitled to have the facts viewed best in her favor." Pl. Mem. 21. At this point, however, it is the court's role to consider whether, based on facts presented, the behavior complained of is an "adverse employment decision." Stated another way, determination of whether there was an adverse employment action for purposes of the prima facie case is for the court to determine as a legal matter. *See, e.g., DeNovellis v. Shalala,* 124 F.3d 298, 312 (1st Cir. 1997) (characterizing as a "legal question" whether plaintiff's "sham assignment constituted an adverse employment action within the meaning of Title VII").

The only salient evidence to which Plaintiff points is her own testimony that she was "feeling like a nobody, was "ostracized," and "just a laughing stock of DOT." Pl. Dep. 156. Taking all of the evidence at face value, and construing it in Plaintiff's favor, the result is the same: Plaintiff has not

shown she suffered an adverse employment action. The persuasive authority cited by DOT supports this ruling. *See* DOT Mem. 16-17. *Cf. Richardson v. Richland Co. Sch. Dist. No. One*, 52 F. App'x 615, 616 (4th Cir. 2002) (finding teacher's assignment to undesirable classroom not adverse employment action); *see Rock v. McHugh*, 819 F. Supp. 2d 456, 470 (D. Md. 2011) (finding no adverse employment action in Rehabilitation Act context based on plaintiff's move from 3-window office to shared cubicle not materially adverse); *Murray v. City of Winston-Salem, N.C.*, 203 F. Supp. 2d 493, 502 (M.D.N.C. 2002) ("[R]elocating [plaintiff in Title VII retaliation claim]'s work space from a private office to a cubicle is not sufficient to constitute an adverse employment action.").[20]

Although Plaintiff may find a cubicle less desirable than a private office, the undersigned finds the move to a cubicle was not so significant that it could be considered to have affected the terms, conditions, or benefits of Plaintiff's employment. Further, even if the cubicle move were to be considered an adverse employment action, Plaintiff's discrimination claim fails because Plaintiff has not provided evidence that other similarly situated individuals who are not African American were treated more favorably. Indeed, Plaintiff's comparator, Ms. Hollingsworth, was also moved from a private office to a cubicle at the same time Plaintiff was moved.

Plaintiff cannot satisfy the third or fourth prong of her prima facie case of discrimination based on her being moved to a cubicle. Summary judgment is appropriate on this ground.[21]

e) Retaliation: Cubicle Move

Plaintiff also claims her move to a cubicle was retaliatory. The requisite elements for a prima facie case of retaliation typically include the following: (1) employee engaged in a protected activity;

---

[20] While the court has not found a Fourth Circuit case expressly ruling that such a move may be an adverse action, that decision is one for this court to make on the facts before it.
[21] To the extent Plaintiff is considered to make a mixed-motive argument sufficient to establish her discrimination or retaliation claims related to her move to a cubicle, the undersigned is unpersuaded. The undersigned finds a reasonable jury could not infer discriminatory intent from Plaintiff's proffered evidence regarding the cubicle transfer.

(2) the employer acted adversely against her;[22] and (3) there was a causal connection between the protected activity and the asserted adverse action. *Ziskie v. Mineta*, 547 F.3d 220, 229 (4th Cir. 2008); *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 218 (4th Cir. 2007). Further, "Title VII retaliation claims must be proved according to traditional principles of but-for causation," which "require[] proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. SW. Med. Ctr. v. Nassar*, __ U.S. __, 133 S. Ct. 2517, 2533 (2013).

For the reasons set out in detail above, the undersigned agrees with DOT that Plaintiff's move to a cubicle was not an adverse employment action or a materially adverse action. As the Court noted in *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006), a retaliation claim requires that the employee show "*material* adversity" because the Court found it important to "separate significant from trivial harms [as] Title VII . . . does not set forth a "general civility code for the American workplace.'" 548 U.S. at 68 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)). Further, Plaintiff cannot establish that, but for her race, the move to the cubicle would not have taken place. *Nassar*, 133 S. Ct. at 2533.

Plaintiff cannot establish a prima facie case of retaliation under Title VII. Summary judgment is appropriate as to this claim, as well.

In addition, as DOT points out, Plaintiff cannot demonstrate the third element of her prima facie retaliation claim because she cannot show a causal connection between her protected activity of filing a charge with SHAC/EEOC and her being moved to a cubicle at the direction of Mr. Eargle.

---

[22] In seeking summary judgment, DOT characterizes this element as not necessarily requiring "proof of an adverse employment action," but requiring "proof of 'materially adverse' action that 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" DOT Mem. 7 (quoting *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). To the extent DOT's characterization of this element requires separate analysis, the undersigned finds Plaintiff has not established that the move to a cubicle was an action so "materially adverse" that it might have dissuaded an employee from making a charge of discrimination. *See* DOT Mem. 15-16, Pl. Mem. 21 (both focusing on Plaintiff's transfer to a cubicle in considering this prima facie element).

Plaintiff conceded that she never talked to Mr. Eargle about race discrimination. *See* Pl. Dep. 170 (noting she did not "necessarily" speak with Mr. Eargle about "race, sex, or any of that"); *see also id.* at 167-71, 213-14. Plaintiff is correct that Mr. Eargle testified he was aware she requested a salary equity analysis. Pl. Mem. 21, Eargle Dep. 29. However, Mr. Eargle became aware of this after Plaintiff went to work for him. Eargle Dep. 29. It is undisputed that Plaintiff began working for Mr. Eargle in 2009, prior to her move to a cubicle. Further, the record contains no indication that Plaintiff referenced racial discrimination in any discussions with Mr. Eargle, nor does it contain evidence that Mr. Eargle was aware of any claims of discriminatory treatment she had received. *See* Pl. Dep. 167-71, 213-14. As Plaintiff cannot establish the decision-maker at the time of her cubicle move was aware of any protected activity by Plaintiff, she cannot establish a prima facie case.

Further, she and Ms. Hollingsworth were moved to cubicles in 2010, prior to Plaintiff's filing of a charge with SHAC/EEOC in 2011. Plaintiff bears the burden of showing the person who took the allegedly retaliatory action knew she had engaged in a protected activity. *See Baqir v. Principi*, 434 F.3d 733, 748 (4th Cir. 2006) (finding no prima facie retaliation case established when employee had not demonstrated relevant officials of employer had knowledge of protected activity at time alleged retaliation took place). Summary judgment is appropriate as to Plaintiff's Title VII retaliation claim, as well.

IV.     Individual Defendants' Motion for Summary Judgment, ECF No. 42

Plaintiff also brought a state-law claim for civil conspiracy against the Individual Defendants: Parnell; Eargle; Watson; and Walsh.[23] Defendant Parnell was Plaintiff's direct supervisor from 2006 through July 28, 2009, and during that time, Plaintiff testified that she had no interactions with the other Individual Defendants. Pl. Dep. 30, 68; ECF No. 42-2. Defendant Parnell was Plaintiff's direct

---

[23] In discussing the Individual Defendants' separate Motion, the undersigned assumes familiarity with facts in this matter as set forth above in connection with DOT's Motion. The court has also reviewed the parties' recitations of fact specific to the Individual Defendants' Motion and has considered them in the light most favorable to Plaintiff. *See* Indiv. Defs.' Mem. 1-13, ECF No. 42-1; and Pl. Resp.2-7, ECF No. 45.

supervisor when she was transferred in 2009. Plaintiff noted Ms. Hollingsworth had not been supervised by Defendant Parnell until she was transferred to the Contract Services Office. *Id.* at 40. Plaintiff acknowledged that she had no evidence that Defendant Parnell did anything to impact the result of the salary equity analysis she had requested. *Id.* at 43.

At the end of July 2010, Defendant Eargle became the supervisor of Plaintiff and Ms. Hollingsworth. *Id.* at 68. Defendant Eargle supervised Plaintiff until November 2012. *Id.* at 85. Defendant Watson, Chief Engineer for Operations, was Plaintiff's third-level supervisor when she worked in the contracts office and her second-level supervisor upon her transfer to the Professional Contract Services office. Watson Dep. 11, 14, 20 (avail. at ECF Nos. 42-4 & 45-7). Defendant Walsh, DOT's Deputy Director of Engineering, was Plaintiff's fourth-level supervisor while she was in the Contracts Administration Office and her third-level supervisor when she moved to the Professional Contract Services Office. Walsh Dep. 18, ECF No. 45-8.

"A civil conspiracy is a combination of two or more persons joining for the purpose of injuring and causing special damage to the plaintiff." *McMillan v. Oconee Mem'l Hosp., Inc.,* 626 S.E.2d 884, 886 (S.C. 2006). "A claim for civil conspiracy must allege additional acts in furtherance of a conspiracy rather than reallege other claims within the complaint." *Hackworth v. Greywood at Hammett, LLC,* 682 S.E.2d 871, 874 (S.C. App. 2009). Stated differently, the acts pleaded in furtherance of the conspiracy must be "separate and independent from other wrongful acts alleged in the complaint, and the failure to properly plead such acts will merit the dismissal of the claim." *Hackworth,* 682 S.E.2d at 875.  In establishing a civil conspiracy claim, a plaintiff is required to produce evidence from which "a party may reasonably infer the joint assent of the minds of two or more parties to the prosecution of the unlawful enterprise." *Island Car Wash, Inc. v. Norris,* 358 S.E.2d 150, 153 (S.C. App. 1987). In considering such a claim, the question is "not whether lawful or unlawful acts or means are employed to further the conspiracy, but whether the primary purpose or object of the combination is to injure the plaintiff." *Lee v. Chesterfield Gen. Hosp., Inc.,* 344 S.E.2d

379, 383 (S.C. App. 1986). "A combination of two or more persons wilfully to injure a man in his trade is unlawful . . . ." *Id.* (internal quotation and citation omitted).

The Individual Defendants present several reasons they are each entitled to summary judgment on this claim. After thorough review of all filings and the applicable law, the undersigned agrees. No reasonable jury could find a conspiracy based on the evidence presented. More particularly, the undersigned finds Plaintiff has not presented sufficient evidence of the joint assent required to survive summary judgment.

The Individual Defendants assert there is no direct or circumstantial evidence of joint assent and list several pieces of evidence the record does not contain. Indiv. Defs.' Mem. 16-17, ECF No. 42-1. For example, the Individual Defendants note the record contains no evidence of communications between any individual Defendants about Plaintiff at any time, other than communications between Defendant Eargle and Defendant Watson and Defendant Walsh to inquire as to Plaintiff's concerns regarding salary equity. *Id.* at 16. In response, Plaintiff correctly quotes *Pridgen v. Ward*, as noting that a civil conspiracy claim may be supported by evidence "direct or circumstantial" from which one "may reasonably infer the joint assent of the minds of two or more parties to the prosecution of the unlawful enterprise." 705 S.E.2d 58, 63 (S.C. App. 2010) (internal quotation omitted); *see* Pl. Resp. 12, ECF No. 45. However, Plaintiff wrongly characterizes Defendants' argument as one that there is no evidence of joint assent because "of an absence of written communications about her, between [the Individual Defendants]," and because Plaintiff requested a salary analysis rather than expressly requesting a raise. Pl. Resp. 12. Plaintiff then asserts that the law requires no direct evidence of this nature. Pl. Resp. 13. Plaintiff is correct that she is not necessarily required to produce direct evidence such as written communications outlining a plan to cause harm to her. However, Plaintiff *is* required to provide evidence from which a reasonable juror could infer joint assent of unlawful enterprise. She has not done so.

Plaintiff merely asserts she has "presented sufficient evidence of connections between the Individual Defendants and actions in concert from which a reasonable jury could find they conspired to harm her." Pl. Resp. 13 (quoting generally to the Facts Section of her response and to page 21 of the deposition of Defendant Walsh). The testimony of Defendant Walsh to which Plaintiff cites indicates only that Walsh and Defendant Watson "have developed a friendship outside of work[.]" Walsh Dep. 21, ECF No. 45-8. Testimony that two individuals who in an employee's supervisory chain had some social contact outside of work does not bolster Plaintiff's claim of conspiracy or provide the inference she seeks. Similarly unavailing is Plaintiff's own generalized opinion offered in response to her counsel's deposition questions that she believed each of the Individual Defendants to be "a racist" and that they acted together to harm her. Pl. Dep. 209-11, ECF No. 42-2. *See Giraldo v. City of Columbia*, ___ F. Supp. 3d, ___, No. 3:12-CV-03357-JFA, 2014 WL 4700645, at *10-12 (D.S.C. Sept. 18, 2014) (granting summary judgment on civil conspiracy claim when plaintiff failed to identify concrete acts of wrongdoing other than those supported only by her own speculative testimony).

Similarly, the evidence Plaintiff set forth in the "Facts Section" of her response that details the involvement of the Individual Defendants in Plaintiff's employment—including decisions to transfer her or to have her workspace relocated—is insufficient to combine and establish actionable civil conspiracy. Plaintiff also states in conclusory fashion that Defendant Parnell "orchestrated" the transfer of Plaintiff to Contract Services for the "ulterior motive" of placing his friend, Ms. Bender, in Plaintiff's former position. Pl. Resp. 5 (citing only Plaintiff's own deposition testimony). Regarding Ms. Bender, however, the Individual Defendants proffered the testimony of Defendant Parnell explaining that Bender was being moved to that role in part because she had written the policies and procedures for that office and had the appropriate education and experience. Parnell Dep. 23-24, ECF No. 42-3.

Considering all inferences in the light most favorable to Plaintiff, Plaintiff's civil conspiracy claim cannot survive summary judgment. The record does not support Plaintiff's argument that any of

the Individual Defendants acted in concert with each other or with anyone else to cause harm to Plaintiff. The Individual Defendants' Motion for Summary Judgment, ECF No. 42, should be granted.[24]

V.     Conclusion

For the reasons set forth above, the undersigned recommends the Motions for Summary Judgment of Defendant DOT, ECF No. 43; and of Defendants Walsh, Parnell, Watson, and Eargle, ECF No. 42, be granted and this matter be ended.

IT IS SO RECOMMENDED.

January 28, 2015                                              Kaymani D. West
Florence, South Carolina                               United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

---

[24] The Individual Defendants also argue they are immune from the state-law civil conspiracy claim based on a relatively recent proviso to the State Budget that addresses such claims brought against state employees such as the Individual Defendants. Indiv. Defs.' Mem. 17-18 (citing S.C. Budget Proviso 117.95). The undersigned is of the opinion that, despite her conclusory arguments otherwise, Plaintiff has made no showing that any of the Individual Defendants acted outside the scope of their official duties. *See* S.C. Code Ann. § 15–78–30(i) (defining "scope of official duty").